733 So.2d 292 (1998)
Robert E. BULLOCK, Appellant,
v.
Cecilia R. BULLOCK, Appellee.
Cecilia Reese Bullock, Appellant,
v.
Robert Earl "Bob" Bullock and Bullock Construction Company, Appellees.
Nos. 97-CA-00062 COA, 93-CA-01330.
Court of Appeals of Mississippi.
November 24, 1998.
Rehearing Denied February 23, 1999.
Certiorari Denied May 27, 1999.
*294 T. Jackson Lyons, Jackson, for Appellant.
James A. Becker, Jr., Susan L. Steffey, Jackson, for Appellee.
Before BRIDGES, C.J., and HERRING and HINKEBEIN, JJ.
BRIDGES, C.J., for the Court:
¶ 1. This Court has been called upon to consider the reasonableness of the financial disposition of a divorce judgment entered in the Chancery Court of Hinds County dissolving the marriage of Robert E. Bullock and Cecilia R. Bullock. Mr. Bullock has appealed, complaining that the trial court erred (1) in awarding lump sum alimony in the amount of $300,000, (2) in failing to offset the award by the amount of the parties' joint liability to Bullock Construction Company; and (3) in awarding attorney fees. Mrs. Bullock has filed a cross-appeal of the chancellor's decision regarding the denial of permanent periodic alimony and the amount of the attorney fees awarded. After a careful review of the record, we find the chancellor did not abuse her discretion. Accordingly, we affirm.

FACTS
¶ 2. Robert (Bob) and Cecilia were married June 27, 1970, in Starkville, Mississippi. Both earned degrees from Mississippi State University, Bob in accounting and Cecilia in education. The parties lived together as husband and wife until July 1991, when Bob filed for divorce. Two children were born of the marriage. Both children reached the age of majority during these proceedings.
¶ 3. When Bob and Cecilia were first married, Bob worked as an accountant for the CocaCola Company in Atlanta. Cecilia, a homemaker, was the primary care giver to the children. While residing in Atlanta, Bob and Cecilia formed Bullock and Bullock Residential Contractors, Inc., specializing in building and designing houses. Cecilia managed the business from the marital home. During approximately three years in operation, Bullock and Bullock built six or seven houses in the Atlanta area.
¶ 4. Bob returned to Jackson in October 1979 to assist his ill father, Earl Bullock, in his commercial construction business, Bullock Construction Company, Inc. The actual *295 terms upon which Bob was to return to Jackson were negotiated and finalized by Cecilia and Earl Bullock before the move was made. Cecilia followed Bob to Jackson a few months later. Eventually, Bob became president and a major shareholder of the closely-held corporation.
¶ 5. After their return to Jackson, Cecilia founded Historical Replications, Inc., in which she was the sole shareholder. Cecilia received approximately $32,000 in salary and fringe benefits as president of Historical Replications. The record is replete with the financial difficulties suffered by Historical Replications because of a spec house that did not sell for three years. Bullock Construction Company loaned to or paid on behalf of Historical Replications $79,030.03 to keep the business afloat.
¶ 6. Adding to the parties' financial problems was the construction of the marital home which was completed in 1987 at a cost of $480,000. The construction costs were financed by a mortgage lender and Bullock Construction Company. Bullock Construction Company held a second mortgage on the house. The deed of trust to Bullock Construction Company was signed by Bob and Cecilia. The promissory note evidencing the debt was signed by Bob.
¶ 7. In July 1991, Bob filed for divorce. Bullock Construction Company sued Historical Replications in that same month for the $79,030.03 arising out of the loans and advances to Historical Replications. The two actions were consolidated for determination of all the issues regarding Cecilia, Bob, and Bullock Construction Company.
¶ 8. The first decree granting the irreconcilable differences divorce of Robert E. Bullock and Cecilia R. Bullock was reversed and remanded by this Court to the Chancery Court of Hinds County for resolution of the following issues: (1) the amount of alimony (lump sum or permanent alimony) and property settlements to be awarded; (2) whether attorney fees would be awarded to either party for the prior divorce action; (3) the disposition of personal property of the litigants; (4) the disposition of marital debts; (5) the liability for payment of marital income taxes; and (6) whether an insurance policy (a life insurance policy on Bob Bullock or health insurance for Cecilia Bullock) should be provided. Undisturbed were the previously stipulated issues: the parties' agreement to a divorce on the ground of irreconcilable differences, all matters concerning child custody and support, and the sale of the marital residence.
¶ 9. After a protracted trial, the chancellor carefully considered the evidence presented and made the following findings of fact and conclusions of law on the record:
¶ 10. Historical Replications was indebted to Bullock Construction Company in the amount of $58,900.43 as evidenced by valid promissory notes. Bullock Construction Company's remaining claim for $20,100 was not supported by a promissory note and, therefore, was denied.
¶ 11. Prior to the divorce, Bob earned in excess of $175,000 annually as president of Bullock Construction Company.
¶ 12. The valuation of Bullock Construction Company was fully litigated by the parties. Using the valuation of Cecilia's expert witness who testified that the net worth of the business was $972,545, the trial court adjusted the calculation to set the net worth of Bullock Construction Company between $500,000 and $700,000.
¶ 13. Due to its occurrence shortly after the divorce action was filed, the trial court found the April 1992 investment of $300,000 by Bob's mother, Mary Bullock, into Bullock Construction Company was an attempt to place the corporation out of Bob's control by making Mary the majority stockholder. The court found Bob controlled the company and its assets and operations.
¶ 14. The trial court found that the net worth of Historical Replications ($120,000) was significantly less than Bullock Construction Company. Cecilia received approximately *296 $32,000 from the company as income and fringe benefits, but had no retirement funds. She earned about $3,000 to $4,000 more teaching an adult enrichment class.
¶ 15. Applying the guidelines of Ferguson v. Ferguson, 639 So.2d 921 (1994), and Hemsley v. Hemsley, 639 So.2d 909 (1994), the chancellor determined that Cecilia was entitled to $300,000 lump sum alimony only. Bob was given a credit for $24,000 paid during the pendency of the earlier appeal and was ordered to pay $76,000 in twenty days from the date of the final judgment of divorce; $50,000 on the first day of September 1997; $50,000 payable on the first day of September 1998; $50,000 payable on the first day of September 1999; and a final payment of $50,000 payable on the first day of September 2000. Bob was also ordered to obtain a life insurance policy on his life to secure the lump sum alimony payments.
¶ 16. Bob was ordered to pay Cecilia $8,340 in his retirement benefits pursuant to a Qualified Domestic Relations Order.
¶ 17. The trial court further found that nothing in the record established that the marital home would have sold for a fair market value of $450,000 to $550,000, making the reversal of the sale of the marital home a moot issue.
¶ 18. Because no note signed by Cecilia was produced evidencing the debt to Bullock Construction Company for the construction of the marital home, and because the company received the excess payments from the foreclosure sale of the house, the court found that Bullock Construction Company was not entitled to recover from Cecilia any deficiency following the foreclosure of the first deed of trust.
¶ 19. The trial court determined that the parties' claims for medical bills, credit cards, and other debts were moot, as well as any claim for federal and state income taxes. Cecilia was awarded certain personal property.
¶ 20. Regarding Cecilia's attorney fees of $90,266.98, the trial court considered the ability of the parties to pay attorney fees and found that, except for the lump sum award of alimony, Cecilia was unable to pay her attorney fees. However, a portion of the fees incurred by Cecilia was for the defense of the action filed by Bullock Construction Company. Bullock Construction Company prevailed on part of its claim against Cecilia. Therefore, no attorney fees were awarded against Bullock Construction Company.
¶ 21. After stating that a reasonable and necessary fee for a divorce case presenting no novel or unique issues would be about $30,000, the court found Cecilia to be entitled to $27,500 from Bob taking into account the $2,500 paid previously by Cecilia.
¶ 22. A final judgment of divorce was entered in which (1) Bullock Construction Company was awarded judgment against Historical Replications in the amount of $58,900.08, plus 12% interest from the date of the promissory notes plus 25% attorney fees; (2) Cecilia was awarded lump sum alimony in the amount of $300,000 secured by a life insurance policy on Bob's life until paid in full; a judgment for certain personal property; and attorney fees in the amount of $27,500; and (3) any and all indebtedness alleged to be owed by Cecilia to Bullock Construction Company for the payment of the marital domicile was canceled.
¶ 23. Bob appeals, raising the following issues:
I. Whether the trial court erred as a matter of law in awarding Cecilia lump sum alimony from Bob's separate estate as it was valued at the time of the divorce proceeding;
II. Whether the trial court erred as a matter of law in awarding lump sum alimony which was greater than the value of Bob's separate estate;
III. Whether the trial court erred as a matter of law in failing to offset the amount of the parties' joint liability to *297 Bullock Construction Company, Inc. against the award to Cecilia; and
IV. Whether the award of attorney fees to Cecilia was reasonable.
¶ 24. By way of cross-appeal, Cecilia presents the following issues:
I. Whether the trial court abused its discretion in determining $30,000 was an appropriate amount for attorney fees and in awarding Cecilia only $27,500; and
II. Whether the trial court erred as a matter of law and abused its discretion in not awarding Cecilia permanent periodic alimony.
¶ 25. Finding no merit to the issues, we affirm.

LEGAL ANALYSIS AND DISCUSSION
¶ 26. "Our scope of review in domestic relations matters is limited under the familiar rule that this Court will not disturb a chancellor's findings unless manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard." Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss.1994) (citing McEwen v. McEwen, 631 So.2d 821, 823 (Miss.1994)).
"[W]e, as an appellate court, will affirm the decree if the record shows any ground upon which the decision may be justified.... We will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors...." Tucker v. Tucker, 453 So.2d 1294, 1296 (Miss.1984) (citing Yates v. Yates, 284 So.2d 46, 47 (Miss.1973)). Further, "findings of fact made by a chancellor may not be set aside or disturbed on appeal unless manifestly wrong. This is so whether the finding relates to an evidentiary fact question ... or an ultimate fact question...." Id. at 1296-97. In order for this Court to say that the chancellor has abused her discretion, there must be insufficient evidence to support her conclusions. Id.

I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN AWARDING CECILIA $300,000 AS LUMP SUM ALIMONY.
¶ 27. The discretionary authority of the chancery court to award lump sum alimony has been long recognized in Mississippi.
[Lump sum alimony] is a settlement between the husband and the wife as to the interest of the latter in his property, and as to the extent of the husband's duty to contribute to her maintenance and support.
The solution of the question of whether or not an allowance of a gross sum should be made must be determined by the facts of the particular case, having due regard to the best interest of the parties and the husband's financial ability to respond to an award in gross. Where the husband's estate is sufficient to enable him to respond to an award in gross, it will often be conducive to the welfare and happiness of both parties to end the relation of debtor and creditor between them by making such an award, and thereby relieve the wife of further dependence upon the continued solvency of the husband and his financial ability to pay a periodical stipend and his continued response to such forced contributions without future legal steps to enforce them.
Tilley v. Tilley, 610 So.2d 348, 351-52 (Miss.1992) (citing Miller v. Miller, 173 Miss. 44, 64, 159 So. 112, 119-120 (1935)).
¶ 28. In awarding lump sum alimony, four factors are to be considered:
(1) [the] substantial contribution to accumulation of wealth by quitting job to become housewife or assisting in husband's business; (2) long marriage; (3) separate income or separate estate meager in comparison to that of payor spouse; and (4) financial security without lump sum alimony. Most important is a comparison of the estates.... Disparity of the separate estates has continued to be the most compelling factor. *298 Creekmore v. Creekmore, 651 So.2d 513, 516-17 (Miss.1995) (citations omitted).
¶ 29. In this case, Cecilia Bullock meets the criteria set out above. The parties were married for twenty-seven yearsa period of time which undoubtedly qualifies as a long marriage. She stayed home to care for the children when the parties decided that was best. Later Bob and Cecilia formed Bullock and Bullock Builders. While Bob continued his employment at the Coca-Cola Company, Cecilia managed the business and contracted out the work from home, certainly contributing to the general welfare of the family's financial status.
¶ 30. Prior to the parties' return to Jackson, Cecilia negotiated and secured a written promise from Bob's father ensuring Bob's future ownership of Bullock Construction Company. It was through Cecilia's foresight that Bob is now president and a major stockholder of the company. Thus, Cecilia made a substantial contribution to the acquisition and accumulation of wealth during the marriage.
¶ 31. The testimony of the parties' expert witnesses and the respective financial statements revealed a large disparity between the two estates.
¶ 32. Concluding Cecilia's separate income and estate are meager in comparison to Bob's, the chancellor found Cecilia receives approximately $32,000 annually as president of Historical Replications, Inc. and about $3,000 to $4,000 from teaching an adult enrichment class. Cecilia is the sole stockholder of Historical Replications, Inc., which the chancellor found to have a net worth of approximately $120,000. Cecilia has no retirement fund. Cecilia will enjoy no financial security without lump sum alimony.
¶ 33. In contrast, the chancellor found Bob receives an annual salary of approximately $175,000 from Bullock Construction Company. After considering the expert testimony, the chancellor found that Bullock Construction Company had an estimated net worth of between $500,000 and $700,000.
¶ 34. Bob's ownership interest in Bullock Construction Company was diluted to 20.24% in 1992 after his mother invested $300,000 in the company in exchange for stock. Based on his ownership interest of 20.24%, Bob's share of Bullock would be $141,680. However, the chancellor found Mary Bullock's investment in Bullock Construction Company was an attempt to place the company out of Bob's control, and stated, "Bob clearly is in control of the company and has apparent control of its assets and operation."
¶ 35. Bob argues that the chancellor abused her discretion by valuing Bob's interest in Bullock Construction Company at the time of the final judgment of divorce rather than at the time of the parties' separation or the filing of the complaint for divorce, and thus the amount of the lump sum alimony award is excessive. Bob asserts that because Cecilia had nothing to do with the increase in value of Bullock Construction Company from July 1991 to December 1996, the valuation of his separate estate for the calculation of lump sum alimony should be the date of separation or July 1991. Bob urges the Court to determine an appropriate date for valuation of assets for all divorce cases. We decline to do so.
¶ 36. The amount and type of alimony to be awarded are matters primarily committed to the chancellor's discretion because of her opportunity to evaluate the equities of the particular situation. Tilley, 610 So.2d at 352. "In the final analysis, all awards should be considered together to determine that they are equitable and fair." Ferguson v. Ferguson, 639 So.2d 921, 930 (Miss.1994).
¶ 37. The initial step in determining the sufficiency or excessiveness of a lump sum alimony award is to determine the fair market value of the separate estates of the parties. Ferguson, 639 So.2d at 929. When equitably dividing marital *299 property upon divorce, the date of valuation is necessarily within the discretion of the chancellor. MacDonald v. Mac-Donald, 698 So.2d 1079, 1086 (Miss.1997).
¶ 38. Both parties presented expert testimony to assist the chancellor in determining the appropriate valuation of Bob's interest in Bullock Construction Company and the net worth of Historical Replications, Inc.
¶ 39. At trial, Kenneth Parker, the accountant for Bullock Construction Company, testified Bob's share of the stockholder's equity in the company was $243,627 as of March 31, 1988; $317,224 as of March 31, 1989; $306,869 as of March 31, 1990; $57,711 as of March 31, 1991; $78,689 as of March 31, 1992; $17,137 as of March 31, 1993; $102,863 as of March 31, 1994; and $115,449 as of March 31, 1995. Mary Bullock invested $300,000 in Bullock Construction Company in April 1992, hence Parker's calculation of Bob's share for 1992, 1993, 1994 and 1995 is based on Bob's 20.24% interest in the company. Prior to 1992, the highest percentage of the company Bob owned was 50.77% in 1989, according to his accountant.
¶ 40. Based on his review of Bullock's financial statements, records and other documents, and utilizing the capitalized earnings method, David Stokes, the accountant for Cecilia Bullock, calculated the fair market value of Bullock Construction Company as of February 29, 1996, to be $972,545.
¶ 41. The record showed that Historical Replications had a net profit of $13,549 in 1992, $22,831 in 1994, and a $19,481 loss in 1995. According to Stokes, as of December 31, 1995, Historical Replications, Inc. had a deficit book value of $37,000.
¶ 42. After carefully considering the testimony, the chancellor found the fair market value of Bullock Construction Company to be between $500,000 to $700,000, and Historical Replications had a net worth of $120,000. Without the stock dilution created by Mary Bullock's investment in the company, Bob's percentage of ownership would have remained at 55.77%, making his equity between $278,850 and $390,390.
¶ 43. The chancellor did not abuse her discretion in awarding Cecilia Bullock lump sum alimony in the amount of $300,000, to be paid according to the schedule set forth in the final judgment of divorce.

II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN CANCELING ANY AND ALL DEBT ALLEGEDLY OWED BY CECILIA TO BULLOCK CONSTRUCTION COMPANY.
¶ 44. In the previous appeal, this Court vacated the order confirming the sale of the parties' marital home, realizing that although vacating the order would not affect the foreclosure sale, it would have a bearing on further proceedings between Cecilia, Bob, Historical Replications, and Bullock Construction Company.
¶ 45. Prior to the first trial, Bob was awarded temporary, exclusive use of the marital home, and ordered to pay installments on the first mortgage. Bullock Construction Company was enjoined from proceeding against the marital home as the second mortgage holder. The parties subsequently agreed to sell the marital home. However, Bob ceased making the first mortgage payments and the house was sold at a foreclosure sale. The entire first mortgage was paid and Bullock Construction Company, as the second mortgage holder, received the remainder, $53,000. Based on the foregoing, the trial court found that "Bullock Construction Company is not entitled to recover from Cecilia for any deficiency following the foreclosure of the first deed of trust."
¶ 46. Bob argues that the trial court erred in failing to offset the lump sum alimony award to Cecilia by the amount of the parties' remaining joint liability to Bullock Construction Company on the second mortgage. However, the record reveals that no promissory note executed by *300 Cecilia evidencing the debt was produced by Bullock Construction Company.
¶ 47. The chancellor did not abuse her discretion in canceling the indebtedness remaining from the second mortgage on the marital home. We find no merit to this assignment of error.

III. THE TRIAL COURT'S DENIAL OF PERMANENT PERIODIC ALIMONY WAS NOT AN ABUSE OF DISCRETION.
¶ 48. By way of cross-appeal, Cecilia maintains that the trial court erred as a matter of law and abused its discretion in denying Cecilia periodic alimony. Cecilia argues that she is entitled to a reasonable amount of periodic alimony in keeping with the parties' standard of living while they were married. However, the financial woes of the parties living above their income were fully delineated in the record.
¶ 49. When reviewing a denial of periodic alimony on appeal, this Court "will only interfere where the decision is seen to be oppressive, unjust or grossly inadequate so as to evidence an abuse of discretion." Turpin v. Turpin, 699 So.2d 560, 564 (Miss.1997).
¶ 50. The following factors must be considered by the chancellor in determining whether or not to award periodic alimony:
(1) the health of the husband and his earning capacity;
(2) the health of the wife and her earning capacity;
(3) the entire sources of income of both parties;
(4) the reasonable needs of the wife;
(5) the reasonable needs of the child;
(6) the necessary living expenses of the husband;
(7) the estimated amount of income taxes the respective parties must pay on their incomes;
(8) the fact that the wife has the free use of the home, furnishing and automobile, and;
(9) such other facts and circumstances bearing on the subject that might be shown by the evidence.
Hemsley, 639 So.2d 909, 912-13 (Miss. 1994); Brabham v. Brabham, 226 Miss. 165, 176, 84 So.2d 147, 152 (1955).
¶ 51. In her findings of fact and conclusions of law, the chancellor determined that an award of periodic alimony was not appropriate in this case. Bob and Cecilia are in excellent health. Each has a college education. Each either owns or manages a business. Cecilia's income is less than Bob's, but her business is relatively sound.
¶ 52. The chancellor did not abuse her discretion in denying Cecilia periodic alimony. This assignment of error is meritless.

IV. THE AWARD OF REASONABLE ATTORNEY FEES TO CECILIA WAS SUPPORTED BY THE EVIDENCE.
¶ 53. Bob contends that the trial court erred in awarding Cecilia $27,500 in attorney fees, when Cecilia demonstrated an ability to pay reasonable attorney fees. Cecilia argues that the amount of attorney fees awarded was inadequate. We find that the award of attorney fees was supported by the evidence and reasonable.
¶ 54. An award of attorney fees will be reversed only if manifest error is found. Bredemeier v. Jackson, 689 So.2d 770, 778 (Miss.1997). The determination of the reasonableness of attorney fees in divorce cases is largely entrusted to the sound discretion of the chancellor, assuming she follows the appropriate standards set out in McKee v. McKee, 418 So.2d 764, 767 (Miss.1982):
[I]n addition to the relative financial ability of the parties, the chancellor is to consider the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor *301 required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.
* * * *
[The allowance of attorney fees] must be fair and just to all concerned after it has been determined that the legal work being compensated was reasonably required and necessary.
¶ 55. Cecilia sought reimbursement from Bob of her fees and costs totaling $90,266.98, which included $14,000 in expert witness fees.
¶ 56. The record shows that the chancellor deducted the fees incurred by Cecilia in defending the action against Historical Replications, Inc. filed by Bullock Construction Company. Finding the adjusted attorney fees were too high for a divorce action involving no unique or novel issues, the chancellor determined $30,000 to be a reasonable and necessary fee. The chancellor awarded her $27,500 in attorney fees, deducting the $2,500 paid previously by Cecilia.
¶ 57. "Generally, unless the party requesting attorney fees can establish the inability to pay, such fees should not be awarded." Bredemeier, 689 So.2d at 778. After considering the parties' respective financial situations, the trial court found that Cecilia had no funds with which to pay her attorney fees except for the lump sum award of alimony, and that Bob was financially able to pay Cecilia a reasonable attorney fee.
¶ 58. The chancellor did not abuse her discretion in awarding attorney fees in the amount of $27,500 to Cecilia.

CONCLUSION
¶ 59. The chancellor in the case before us properly made her decision based on a careful consideration of the testimony presented as evidenced by her well reasoned findings of fact and conclusions of law as directed in Ferguson, 639 So.2d at 928. To reconsider the facts of this case would essentially usurp the discretionary role given to the chancellor in this case, and violate our standard of review. The chancellor's findings were not manifestly wrong nor were the findings clearly erroneous. The chancellor did not apply an erroneous legal standard. Therefore, we affirm the judgment of the circuit court, and grant statutory damages to Cecilia Bullock.
¶ 60. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED AS TO THE DIRECT AND CROSS APPEAL. STATUTORY DAMAGES AND INTEREST ARE AWARDED TO CECILIA R. BULLOCK. COSTS OF THIS APPEAL ARE ASSESSED TO ROBERT E. BULLOCK.
McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HERRING, HINKEBEIN, KING and SOUTHWICK, JJ., concur.
PAYNE, J., not participating.